Hugo A. RAMIREZ, M.D., Appellant,

v.

**TEXAS STATE BOARD OF MEDICAL EXAMINERS, Appellee.**

No. 03–98–00436–CV.

Court of Appeals of Texas, Austin.

June 30, 1999.

Cindy Olson Bourland, Geoffrey D. Weisbart, Hance, Scarborough, Wright & Weisbart, L.L.P., Austin, for appellant.

John Cornyn, Atty. Gen., Don Walker, Deputy Chief, Office of Atty. Gen., Administrative Law Division, Austin, for appellee.

Before Chief Justice ABOUSSIE, Justices JONES and PATTERSON.

MARILYN ABOUSSIE, Chief Justice.

Appellee Texas State Board of Medical Examiners (the "Board") denied appellant Hugo Ramirez's application for reinstatement of his medical license. Ramirez sought judicial review of the Board's order in district court. The district court upheld the Board's order, holding that the decision not to grant Ramirez's reinstatement was supported by substantial evidence. We will affirm the district court's judgment.

## BACKGROUND

The Board revoked Ramirez's license to practice medicine in 1987. *See* Medical Practice Act ("MPA"), Tex.Rev.Civ. Stat. Ann. art. 4495b, § 4.01(a) (West Supp. 1999). The 1987 revocation order was predicated on complications arising from Ramirez's medical treatment of five liposuction patients.[1] The order lists numer-

---

1. Before the Board revoked his license, Ramirez practiced obstetrics and gynecology in Pasadena, Texas. In 1986, he added liposuction procedures to his practice. Two of the liposuction patients listed in the 1987 revocation order died, while the other three suffered complications requiring extensive additional medical care.

ous deficiencies in Ramirez's treatment of the five patients and concludes that Ramirez: (1) engaged in unprofessional or dishonorable conduct that was likely to injury the public; (2) failed to practice medicine in an acceptable manner consistent with the public health and welfare; and (3) administered a treatment that was nontherapeutic in the manner in which it was administered. *See* MPA § 3.08(4), (4)(E), (18). Ramirez did not testify at the 1987 revocation proceeding and did not appeal the revocation.[2]

Ramirez sought reinstatement of his medical license in 1989, 1990, 1991, and 1992. The Board denied reinstatement each year. In 1993, the Texas Legislature amended the procedure for reinstating canceled, revoked, or suspended medical licenses.[3] The statute now requires applicants seeking medical license reinstatement to prove that such reinstatement is in the best interests of: (1) the public; and (2) the applicant. *See* MPA § 4.10(b). The statute permits the applicant to seek judicial review if the Board denies reinstatement. *See id.* § 4.10(c).

In 1994, Ramirez sought reinstatement under the new provisions and the Board again denied his application. Ramirez appealed to the district court, which affirmed the Board's order; he then appealed to this Court. In *Ramirez v. Texas State Board of Medical Examiners*, 927 S.W.2d 770 (Tex.App.—Austin 1996, no writ), this Court determined that "in enacting the 1993 amendments to MPA § 4.10, the legislature contemplated that the Board would provide an evidentiary hearing on each application for reinstatement" and that "an application for reinstatement under MPA § 4.10 initiates a contested case" within the meaning of the Administrative

Procedure Act ("APA").[4] *Ramirez*, 927 S.W.2d at 773. Because the Board did not follow the procedures required for a contested case, we remanded the cause to the Board for further proceedings. *See id.*

Pursuant to our remand, an administrative law judge ("ALJ") with the State Office of Administrative Hearings conducted a contested case hearing on Ramirez's 1994 application for reinstatement. The ALJ admitted evidence from both parties and allowed twelve witnesses to testify on Ramirez's behalf. The Board did not present any witnesses. The ALJ submitted a Proposal for Decision to the Board in May 1997 in which she recommended that the Board deny Ramirez's application for reinstatement.

On August 7, the Board issued a final order denying Ramirez's application for reinstatement. The Board stated in several of its findings of fact that Ramirez had not shown that the medical practice deficiencies specified in the 1987 revocation order had been corrected. The Board concluded that Ramirez failed to prove that it was in his or the public's best interests to reinstate his license. Ramirez appealed the order to the district court, and the district court found that the decision of the Board was supported by substantial evidence. The 1997 order denying Ramirez's 1994 application for reinstatement is now before this Court, and he presents eleven issues for our review.

## DISCUSSION

Ramirez's eleven issues can be grouped into three broad arguments: (1) the Board's conclusion that he failed to prove reinstatement is in the best interests of the public is not supported by substantial

---

**2.** Ramirez instead attacked the revocation action in federal court, contesting the procedure that the Board used in revoking his license. Ramirez's challenge in federal court ultimately failed.

**3.** *See* Act of May 30, 1993, 73d Leg., R.S., ch. 862, § 27, 1993 Tex. Gen. Laws 3394 (Tex. Rev.Civ.Stat.Ann. art. 4495b, § 4.10(a)-(c)

(West Supp.1999)). Before the 1993 amendment, several of the requirements now found in section 4.10(a) comprised the entire procedure for reinstatement. *See* Tex.Rev.Civ. Stat. Ann. art. 4495b, § 4.10(a) (West Supp. 1999).

**4.** *See* Tex. Gov't Code Ann. §§ 2001.001–.902 (West 1999).

evidence; (2) the Board's conclusion that he failed to prove reinstatement is in his best interests is not supported by substantial evidence; and (3) the Board's actions and order violated his right to due process. We note at the outset that the Board is not required to reinstate a physician's license once revoked, and the burden is on the applicant to prove that reinstatement is in the best interests of the public as well as the physician.

**Standard of Review**

This is the first instance in which we have been called upon to review an administrative decision by the Board concerning a physician's application for reinstatement; before the 1993 amendments to the MPA, no statutory authority existed for judicial review of administrative reinstatement decisions. *See Burkhalter v. Texas State Bd. of Medical Examiners*, 918 S.W.2d 1, 3 (Tex.App.—Austin 1996, no writ). Our review of this administrative decision, however, is guided by the familiar standards of the substantial evidence scope of review, defined by the APA. *See* APA § 2001.174(2)(E); *Texas State Bd. of Medical Examiners v. Scheffey*, 949 S.W.2d 431, 435 (Tex.App.—Austin 1997, pet. denied).

■ In conducting a substantial evidence review, we must first determine whether the evidence as a whole is such that reasonable minds could have reached the conclusion the agency must have reached in order to take the disputed action. *See Texas State Bd. of Dental Examiners v. Sizemore*, 759 S.W.2d 114, 116 (Tex.1988); *Dotson v. Texas State Bd. of Medical Examiners*, 612 S.W.2d 921, 922 (Tex.1981). The test is not whether the agency made the correct conclusion, but whether some reasonable basis exists in the record for the agency's action. *See Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex.1984). We may not substitute our judgment for that of the agency as to the weight of the evidence. *Public Util. Comm'n v. Gulf States Util. Co.*, 809 S.W.2d 201, 211 (Tex.1991). Decisions of an administrative agency are presumed to be supported by substantial evidence, and the appealing party bears the burden of showing a lack of substantial evidence. *See Charter Medical–Dallas, Inc.*, 665 S.W.2d at 453. The appealing party cannot meet this burden merely by showing that the evidence preponderates against the agency decision. *See id.* at 452. If substantial evidence would support either affirmative or negative findings, the reviewing court must uphold the order, resolving any conflicts in favor of the agency's decision. *See id.* at 453.

**Issues One through Eight: Best Interests of the Public**

■ Ramirez presents eight arguments to support his contention that the Board's conclusion that his reinstatement is not in the best interests of the public is not supported by substantial evidence. We will first address Ramirez's complaint, raised in issue two, that the Board disregarded the parties' stipulation that the 1987 order revoking his medical license would be of limited relevance in deciding whether his license should be reinstated.

The stipulation states, in relevant part:

The parties stipulate that the August 21, 1987 Order and its findings of fact and conclusions of law are not in issue and are relevant only for a limited purpose in that they provide the basis for the revocation, and will not be collaterally attacked by the parties. Rather, the issue for determination is whether reinstatement of Dr. Ramirez's license is in the best interests of the public and in the best interests of Dr. Ramirez pursuant to Section 4.10(b) of the Medical Practice Act.

Ramirez contends that, in light of this stipulation, the Board improperly relied on findings and conclusions contained in the 1987 revocation order in its decision not to reinstate his license. He complains specifically of findings of fact two and twenty-five:

2. On August 21, 1987, the Board entered an order (the Order) revoking Applicant's license because he had engaged in practices which were a professional failure to practice medicine in an acceptable manner consistent with the public health and welfare and which constituted dishonorable or unprofessional conduct likely to injury the public. . . .

25. Applicant has been found to have provided care which was a gross deviation from the standard, resulting in the death of two patients and serious problems for three others.

Ramirez's argument suggests that the stipulation prevents the 1987 revocation order from being evidence of anything other than the mere fact that his license was revoked. We disagree with his interpretation of the stipulation's effect. The stipulation clearly states that the 1987 order and its findings and conclusions "provide the basis for the revocation," and that the order will not be collaterally attacked by the parties. The stipulation does not state that the 1987 order is not to be used as the starting point for the Board's inquiry into whether Ramirez has remedied the deficiencies that led to his revocation. The 1987 order includes factual findings that Ramirez committed gross deviations from the standard of care in his performance of liposuction on five patients; it lists the various ways in which the standard of care was breached with regard to these five patients; it explains that each of these five patients suffered complications after the liposuction procedure; and it finds that two of the patients ultimately died. Ramirez never appealed the revocation order,[5] and it was admitted into evidence below without objection.

The Board is charged with regulating the privilege of practicing medicine in a manner that protects the public interest. *See* MPA §§ 1.02, 3.08; *Thompson v. Tex-*

as *State Bd. of Medical Examiners,* 570 S.W.2d 123, 129 (Tex.Civ.App.—Tyler 1978, writ ref'd n.r.e.) ("The State seeks to protect the general health, safety and welfare of its citizens through the actions of its Board of Medical Examiners."). The Board persuasively argues that, without considering why a doctor's license is revoked, it is impossible to determine if reinstatement is in the best interests of the public. We hold that the Board may consider past medical deficiencies in determining whether an applicant's reinstatement is in the best interests of the public; therefore, it was not improper for the Board to consider the 1987 revocation order to determine whether Ramirez proved that he had addressed his past medical practice deficiencies. The contention raised in Ramirez's second issue is overruled.

■ Our resolution of issue two also disposes of Ramirez's complaint in issue seven that the Board's 1997 order denying his reinstatement improperly emphasized his failure to correct liposuction practice deficiencies. Ramirez states in his brief that "the Board knows" that if his license is reinstated, he does not intend to practice in the area of liposuction but will limit his practice solely to obstetrics and gynecology, and that the issue in this case is whether Ramirez should be reinstated to practice obstetrics and gynecology. We have already stated, however, that it is not improper for the Board to consider an applicant's past deficiencies in determining whether reinstating the applicant's license is in the best interests of the public. Additionally, Ramirez has pointed us to no evidence in the record to indicate that the parties agreed that the reinstatement decision would be limited to Ramirez's competence in obstetrics and gynecology. The stipulation upon which Ramirez relies to argue that the Board improperly consid-

---

**5.** Although Ramirez contends that he "still strenuously contests the findings supporting the 1987 revocation," the fact remains that Ramirez never challenged the findings and conclusions stated in the 1987 order through the administrative process. Ramirez's charge in his brief that there are many "falsehoods contained within the 1987 Order" does not affect our review of this properly admitted, administratively unchallenged document.

ered the 1987 revocation order does not manifest an intent to so limit the inquiry.

Furthermore, the Board's 1997 order does not identify liposuction specifically as an area of concern, but rather states that medical deficiencies specified in the 1987 revocation order have not been corrected. While it is true that the 1987 revocation order is based on Ramirez's deficiencies in performing liposuction procedures, there were a number of deficiencies identified that could affect the practice of medicine in any area. For example, the 1987 order states that, during one liposuction procedure, Ramirez failed to provide a sterile environment by leaving open the doors to the operating room, failing to wear a surgical mask during the procedure, and failing to require other attendants to wear surgical masks or hair covering. There were also findings that Ramirez failed to provide appropriate post-operative care by failing to monitor patients while they were in the recovery room after surgery. Ramirez testified during the reinstatement hearing that he was interested in researching the feasibility of uterine transplants in women and performing such an operation should his license be reinstated. Therefore, there was some basis in the record for the Board's concern with Ramirez's failure to remedy his deficiencies in performing a surgical procedure. Ramirez's seventh issue is overruled.

 In his third issue, Ramirez contends that the Board's order is supported by medical assumptions and conclusions made by an ALJ with no medical training. He complains specifically of the following four findings of fact:

9. Participation at a two-week fellowship program in normal obstetrics did not show Applicant's medical practice deficiencies specified in the Order have been corrected.

10. Attendance at continuing medical education courses in obstetrics, gynecology, and ultrasound did not show Applicant's medical practice deficiencies specified in the Order have been corrected. . . .

13. Applicant did not show he has corrected the medical practice deficiencies which were determined to be gross deviations in standards of patient care as set forth in the Order. . . .

26. It is not in Applicant's best interest to be reinstated until he shows he is competent to practice medicine in an acceptable manner consistent with the public heath and welfare.

Ramirez argues that a lay person could not compare the 1987 revocation order with the evidence he presented at the hearing without the assistance of evidence or witness testimony from the Board and reach the factual conclusion that he has not corrected past medical practice deficiencies. He claims that the district court improperly relied on the mental reasoning and knowledge of the Board members when it affirmed the Board's decision. Ramirez cites *Dotson v. Texas State Board of Medical Examiners*, 612 S.W.2d 921 (Tex.1981), to support his argument that the Board's decision must be reversed because there is no expert testimony in the record supporting the Board's conclusions.

In *Dotson*, the Board suspended the medical licenses of two doctors for prescribing drugs in a non-therapeutic manner. *See* 612 S.W.2d at 921–22. Two investigators for the Board testified at the suspension hearings that they had engaged in an undercover assignment to secure prescription drugs from the doctors by falsifying symptoms concerning their physical conditions. The Board presented no evidence to show that the doctors knew or should have known that the investigators were not bona fide patients with legitimate complaints. The two doctors presented uncontroverted testimony that the drugs were proper medications for the conditions they had diagnosed and the amounts they had prescribed were not excessive. *See id.* at 923.

The supreme court found that, in the absence of any expert testimony to support the Board's factual conclusion that the

drugs were non-therapeutic in the manner in which they were prescribed, substantial evidence did not support the license suspensions. *See id.* at 923–24. The court rejected the Board's contention that, since all of the members of the Board were professionals, it was not necessary to introduce medical expert testimony that the drugs were not therapeutic as prescribed. The court's holding noted that APA requirements limit a court's review to the record before the Board and that "[a] court obviously cannot review knowledge, however expert, that is only in the minds of one or more members." *Id.* at 923.

Ramirez argues that substantial evidence does not support the Board's 1997 order because the Board called no witnesses to interpret the medical findings listed in the 1987 revocation order or to testify to Ramirez's perceived current medical deficiencies. It is true that many of the numerous findings in the 1987 revocation order utilize technical medical language,[6] but *Dotson* does not suggest that members of the Board require expert testimony to explain to them the meaning of findings set out in one of the Board's own orders. Further, expert testimony is not required to recognize, for example, that Ramirez offered no evidence that since 1987 he had received training in the proper performance of liposuction.

Ramirez presented documentary evidence showing that in the ten years between his license revocation and his 1997 reinstatement hearing, he completed over one thousand hours of continuing medical education course hours; however, none of those hours involve liposuction training and only twenty-one hours focused specifically on the subject of infection control—one of the chief complications experienced by his earlier surgery patients. On the facts presented to us in this case, we hold that the Board's conclusions in its order

denying Ramirez's reinstatement could be reached on the evidence in the record and without the assistance of additional expert testimony in behalf of the Board.

We recognize that Ramirez insists he will limit his practice to obstetrics and gynecology if his license is reinstated and that he believes it is egregiously unfair to deny his reinstatement application on the basis of his earlier deficiencies. As we have explained above, however, the record contains no stipulation that the Board was limiting the test of the "best interests of the public" to Ramirez's obstetrics and gynecology practice, and there is no suggestion in the record that the Board would be willing to issue Ramirez a medical license limited to specific areas of medical practice, even assuming it could. Issue three is overruled.

In issue eight, Ramirez contests finding of fact twelve, which states, "Applicant declined taking a recognized medical examination ... to demonstrate he has corrected the medical practice deficiencies specified in the Order." Ramirez contends that this finding mischaracterizes his testimony, because he stated that he would submit to reexamination if the MPA required it for reinstatement. Because the MPA does not require him to take an exam in order to have his medical license reinstated, Ramirez argues that the Board exceeded its statutory authority by penalizing him for not meeting a non-statutory requirement.

The MPA does not define "best interests of the public," but it does permit the Board to "make rules, regulations, and bylaws not inconsistent with this Act as may be necessary for the governing of its own proceedings, ... the regulation of the practice of medicine in this state, and the enforcement of this Act." MPA § 2.09(a).

---

**6.** For example, the Board found that Ramirez: "failed to perform a hemoglobin or hematocrit on Patient Number II following surgery"; "failed to monitor [Patient II's] blood volume and to understand the medical significance of electrolyte and red cell mass

problems during the surgical procedure"; "failed to order an electrocardiogram for Patient III"; and "failed to recognize the clinical signs and symptoms of septicemia and failed to treat Patient III appropriately for sepsis."

The Texas Administrative Code provides only three requirements for reinstatement when a medical license has been canceled for cause:

 (a) The applicant must complete in every detail the application for reinstatement of license for cause, including payment of the required application fees.

 (b) The applicant must appear before the board to state the request for reinstatement of license.

 (c) Application for reinstatement following cancellation for cause cannot be considered more often than annually.

22 Tex. Admin. Code § 167.1 (1998).[7]

If a medical license has expired, the Administrative Code requires a physician desiring a new license to submit to reexamination and to comply with the requirements and procedures for obtaining an original license. *See id.* § 163.12. Dr. Ramirez's license did not expire; it was canceled for cause. We need not evaluate the policy of requiring a physician whose license has expired to submit to reexamination while not requiring a physician whose license has been revoked for cause to do the same; that is the statutory scheme before us.

The Board apparently suggested to Ramirez that a passing score on a recognized medical exam would provide objective evidence of his competence as a physician, although it would not guarantee that reexamination would result in reinstatement.[8] Ramirez testified at the hearing before the ALJ that he would take an exam if it were a statutory requirement, but that he would "have a problem with" taking a test if he was being "singled out" by the Board.

We are concerned with the Board's lack of guidance concerning the proof needed to show that a medical license reinstatement is in the best interests of the public. In this case, however, the ALJ testified during the Board's hearing to consider her Proposal for Decision that she found Ramirez's statement that he had done everything in his power to be reinstated "unconvincing" in light of his assertion that he would take an examination only if required to do so by statute. Therefore, we do not believe the Board's fact finding penalized Ramirez for not meeting a non-statutory requirement, but rather reflected its concern that Ramirez would not voluntarily submit to a process that could objectively measure his knowledge and ability to practice safe medicine. The Board did not state that the license should not be reinstated because of Ramirez's failure to take the test; it merely lists an objective standard Ramirez could have provided the Board but did not. Issue eight is overruled.

In issues four, five, and six, Ramirez essentially complains that the Board did not give appropriate weight to the testimonial evidence of several of his witnesses. Of course, this Court is not entitled to reassess the weight and credibility of the evidence before the agency. Nevertheless, we will first address his complaint in issue four that the Board did not properly consider the testimony of Dr. Herbert Sandmire. Dr. Sandmire is an obstetrician and gynecologist, and he teaches a continuing medical education fellowship in obstetrics in Green Bay, Wisconsin. Ramirez participated in the obstetrics fellowship for two weeks and Dr. Sandmire testified by video deposition that, based on his daily observa-

---

**7.** It is undisputed that Ramirez has met these requirements.

**8.** The following exchange took place during Ramirez's appeal to the district court:

 Board's Attorney: [T]he law on the books supports the Board's position that a necessary objective standard for reinstatement would be a standardized test.

 . . . .

 The Court: Are you saying that if he took that [test] and passed it that he would be reinstated?

 Board's Attorney: No. But I am saying that is objective evidence. That is evidence that would allow the Board to look at his qualifications.

tions of Ramirez, he believed Ramirez to be a very good obstetrician. Dr. Sandmire's testimony is very complimentary of Ramirez's ability and competence as an obstetrician, and he testified specifically that his program covered neonatal newborn infection prevention and that Ramirez did well in that category.

The fact that the evidence may even preponderate against the Board's decision does not show that substantial evidence does not support the Board's decision. *See Charter Medical–Dallas, Inc.,* 665 S.W.2d at 452. That the Board did not find Dr. Sandmire's testimony regarding his two-week observation of Ramirez as persuasive as Ramirez had hoped does not permit us to substitute our judgment on the weight of Dr. Sandmire's testimony for that of the Board. *See Gulf States Util. Co.,* 809 S.W.2d at 211. Dr. Sandmire's testimony was limited to his observation of Ramirez's qualifications and performance as an obstetrician during only a two-week course. Dr. Sandmire stated on cross-examination that he did not know the reasons Ramirez's license had been revoked, and his testimony did not touch upon many of the deficiencies identified in the 1987 order that justified revocation. Issue four is overruled.

Ramirez's complaints in issues five and six address the evidence before the Board that his community of Pasadena needs more Spanish-speaking obstetricians. He argues that the Board did not give adequate consideration to his evidence regarding this community need in determining whether his reinstatement is in the best interests of the public.

Ramirez speaks Spanish and presented numerous witnesses who testified that Pasadena needs more obstetricians with whom Spanish-speaking women can easily communicate; the witnesses explained the possibility of symptomatic information being lost in the translation from Spanish to English, and the resulting danger of misdiagnosis. These witnesses included several of Ramirez's former female employees and patients, all of whom regarded Ramirez as a caring and compassionate obstetrician to whom they would go for obstetric and gynecological care. They spoke of his willingness to treat patients regardless of the patients' ability to pay, and they testified that they believed it was in the best interest of the Pasadena community for Ramirez's license to be reinstated.

The mayor of Pasadena also testified on Ramirez's behalf. He stated that Pasadena needs a Spanish-speaking physician, and that it is difficult for women without transportation to travel to Houston to receive health care. Ramirez also presented the expert testimony of Dr. Joseph Kotarba, a medical sociologist, who conducted a study of the east Harris County area and concluded that there is a need for additional obstetric and gynecological services in Pasadena.

The Board stated in its findings of fact that Ramirez "did not establish a need for a Spanish-speaking obstetrician and gynecologist in Pasadena, Texas." Based on Dr. Kotarba's study, the Board found that "Pasadena's ratio of the number of women of child-bearing age per obstetrician and gynecologist is below average compared to other Texas cities of similar size"; and that

> Applicant did not establish the number of female Hispanic women of child-bearing age who speak only Spanish, are low income, are without adequate transportation, and who would be more comfortable with a Hispanic obstetrician and gynecologist in Pasadena, Texas.

Ramirez contends that the Board's findings and conclusions regarding public need are against the great weight and directly contrary to the evidence, and that the Board did not sufficiently review the expert testimony of Dr. Kotarba. We must note again that, even if Ramirez's evidence preponderates against the Board's decision, we cannot substitute our judgment for that of the Board regarding the need for a Spanish-speaking obstetrician in a community with a significant Hispanic population. *See Gulf States Util. Co.,* 809

S.W.2d at 211; *Charter Medical–Dallas, Inc.,* 665 S.W.2d at 452.

Furthermore, the ALJ made detailed findings in her Proposal for Decision outlining the flaws in Ramirez's evidence. The ALJ noted that only one of Ramirez's witnesses regarding community need had seen the 1987 revocation order, so the testimony regarding community need should be given less weight. The ALJ also explained that the mayor admitted on cross-examination that his office had never attempted to recruit Hispanic physicians, he did not know how may Hispanic physicians were in Pasadena, and he had not discussed with Pasadena physicians the need for more Hispanic physicians. The ALJ concluded that she believed the mayor's testimony was based on Ramirez's civic involvement more than on documented community need or the mayor's familiarity with Ramirez's medical abilities. The ALJ analyzed Dr. Kotarba's study and explained why it failed to persuasively establish the need for a Spanish-speaking physician in Pasadena; those findings were adopted by the Board and are recited above.

Ramirez complains that the Board's review of the evidence was insufficient; however, the ALJ's factual findings show that she reviewed the evidence and simply failed to find it persuasive. An administrative agency is the judge of the weight to be accorded the evidence presented, and this Court may not substitute its judgment for that of the Board as to the weight of the evidence on questions committed to the Board's discretion. *See Gulf States Util. Co.,* 809 S.W.2d at 211; *Charter Medical–Dallas, Inc.,* 665 S.W.2d at 452. Moreover, even if Ramirez conclusively established a community need for a Spanish-speaking obstetrician, the Board's determination that Ramirez has failed to remedy past medical deficiencies would constitute substantial evidence to support the Board's failure to find that Ramirez's reinstatement is in the best interests of the public. Issues five and six are overruled.

■ Finally, Ramirez's first issue contends that the Board's decision could not be supported by substantial evidence because the Board called no witnesses and offered no evidence. This issue misconstrues the law governing the reinstatement proceeding. The statute places the burden on Ramirez as the applicant to prove that his reinstatement is in the best interests of the public. *See* MPA § 4.10(b). The question we ask in this substantial evidence review is not whether the Board produced substantial evidence that reinstatement was not in the best interests of the public, but whether reasonable minds could have looked at the evidence as a whole and reached the conclusion that Ramirez failed to prove that reinstatement was in the best interests of the public.

The majority of Ramirez's witnesses stated on cross-examination that they had not read the revocation order and did not know what deficiencies had led to his revocation; therefore, the witnesses could not address whether Ramirez had remedied those deficiencies. Ramirez's documentary evidence shows that he participated in over one thousand hours of continuing medical education courses, but none of these courses dealt with the topic of liposuction—the procedure cited in the revocation order—and only twenty-one hours dealt with the subject of infection—one of the chief complications experienced by his liposuction patients. Reasonable minds could look at this evidence as a whole and conclude that Ramirez's failure to address the specific deficiencies that led to his revocation is tantamount to a failure to prove that his reinstatement would be in the best interests of the public. Ramirez's first issue is overruled.

We have overruled the contentions raised in Ramirez's first eight issues. We hold that the Board's conclusion that reinstating Ramirez's medical license is not in the best interests of the public is supported by substantial evidence.

*Issues Nine and Ten: Best Interests of the Applicant*

In issues nine and ten, Ramirez challenges the Board's conclusion that he failed to prove that reinstatement of his medical license was in his best interests. MPA section 4.10(b) requires an applicant to prove that reinstatement would be in the best interests of both: (1) the public; *and* (2) the applicant. *See* MPA § 4.10(b) (emphasis added). We have already held, in overruling Ramirez's first eight issues, that substantial evidence supports the Board's conclusion that Ramirez failed to prove that reinstatement would be in the best interests of the public. Therefore, we need not reach the arguments raised in Ramirez's ninth and tenth issues.

*Issue Eleven: Due Process*

■ In his eleventh issue, Ramirez complains that the Board has repeatedly denied his applications for reinstatement without providing guidelines or standards for him to meet in order to achieve reinstatement. Ramirez contends that such action by the Board is arbitrary and capricious and violates his due process rights. Ramirez cites no legal authority for his implied argument that he possesses an entitlement to have his medical license reinstated, and he points to no specific act by the Board that violates his rights other than the Board's failure to reinstate his medical license.

The practice of medicine is a privilege, not a right. *See* MPA § 1.02(1). The Board has a duty to license medical practitioners and to protect the public by revoking the license of one whose medical practices are deficient. Ramirez suffered the consequence. The Board may reinstate a medical license if it finds reinstatement to be in the bests interests of both the public and the practitioner. The Board gave Ramirez the opportunity to regain the privilege of practicing medicine through a contested case hearing in which Ramirez was represented by counsel and during which he presented twelve witnesses and forty exhibits. The Board's decision not to present evidence but rather to evaluate Ramirez's evidence through cross-examination and argument does not render the Board's decision arbitrary and capricious. While Ramirez may be understandably frustrated by the Board's failure to provide specific guidelines for achieving reinstatement to the point that he believes the Board is predisposed against his reinstatement, his interests and concerns are not the only issue. There is nothing in the record before us to support Ramirez's assertion that the Board seeks to punish him by depriving him of his profession. That Ramirez did not prevail in this reinstatement proceeding does not constitute reversible error. Issue eleven is overruled.

## CONCLUSION

We hold that the Board's decision that Ramirez failed to prove that reinstatement of his medical license was in the best interests of the public is supported by substantial evidence and the trial court did not err in affirming the Board's order. We therefore affirm the trial court's judgment.