# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00049-CV

**Toby L. Keeton and James T. Hays, D.V.M., Appellants**

**v.**

**Texas Racing Commission, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT NO. GN201681, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellants Toby L. Keeton and James T. Hays, D.V.M., appeal a district court judgment which upheld an order by appellee Texas Racing Commission, imposing penalties after a racehorse trained by Keeton and owned by Hays tested positive for a prohibited drug. In three issues, appellants contend that the Commission's order is invalid because it is not supported by substantial evidence and imposes new penalties not promulgated through "notice and comment" rulemaking. Furthermore, the Commission's rule placing the burden on appellants to disprove the Commission's allegations violates appellants' due process rights. For the reasons discussed below, we affirm the judgment of the district court upholding the Commission's order.

**FACTUAL AND PROCEDURAL BACKGROUND**

On March 25, 2001, at Manor Downs racetrack near Austin, racehorse Sheza Special Chick finished first in a timed trial. Immediately after the race, samples of the horse's serum and urine were taken for drug testing, as required by the Commission's rules. *See* 16 Tex. Admin. Code §§ 319.361-.362 (2003).[1] The sample was split, with part of it sent to the Texas Veterinary Medical Diagnostic Laboratory at Texas A & M ("Texas A & M laboratory") for testing and part of it frozen. The Commission splits the samples so that if the original sample tests positive for a prohibited substance, the owner or trainer of the horse may request that the retained sample be sent to another lab for testing. *Id.* § 319.362.

The Texas A & M laboratory notified the Commission staff on April 5 that the urine sample tested positive for Clenbuterol, a "Class 4" prohibited substance under Commission equine medication guidelines. On the same day, Commission investigator Thomas Neely notified Keeton of the test results and of his right to have the retained sample tested. Keeton requested testing by the Louisiana State University (LSU) School of Veterinary Medicine laboratory in Baton Rouge. As provided by Commission rules, Keeton was present when the sample was packed on April 11. *See id.* § 319.362(d). Neely removed the sample from the freezer and packed it in a cooler with ice packs. He placed a chain of custody form on the cooler then secured the lid of the cooler with a metal shipping seal and locked it with a padlock. Lastly, Neely delivered the cooler to Airborne Express at the Austin airport. Airborne then attached a shipping bill to the cooler. Keeton signed

---

[1] Because the relevant provisions of the Texas Administrative Code have not changed substantively during the pendency of this case, for convenience we will refer to the current code provisions.

a form stating that he had witnessed and approved the packing and shipping of the sample with no objections.

On Friday, April 13, the cooler was returned to the Commission's office, never having reached LSU because the shipping label had become detached. Pat Barker, an administrative assistant with the Commission, thinking that LSU had returned the empty cooler to be reused, placed the cooler in a file room that was neither refrigerated nor locked. The following Monday, April 16, Barker received a message from LSU that it had not received the sample. She went to the file room and found the cooler in the same place as she had left it, with the metal seal locked and chain of custody form intact. Barker informed Neely about the problem, and he instructed her to move the cooler to the freezer, which she did. Barker also informed her supervisor, deputy director of racing John Williams. The next morning, Barker unlocked the freezer for Williams, who found the cooler with the chain of custody form and the seal and lock intact. Williams took the cooler to Airborne for shipment to LSU, which received the sample on April 18. LSU testing confirmed that the horse's urine contained Clenbuterol.

On May 24, Keeton appeared at the board of stewards'[2] hearing concerning the drug violation. At the hearing, the stewards suspended Keeton's trainer's license for forty-five days and fined him $1,250 because of the positive tests, noting on their ruling that this was Keeton's third medication violation within twelve months. The stewards also disqualified the horse from the March 25 race and redistributed the purse. Both Keeton and Hays appealed the ruling.

---

[2] A steward is a "racing official with general authority and supervision over . . . all licensees at a racetrack during a race meeting." Tex. Rev. Civ. Stat. Ann. art. 179e, § 1.03(35) (West Supp. 2003). Racehorse trainers fall under the ambit of the stewards' authority because they are licensed by the Commission. *Id.* § 1.03(36).

On October 30, an administrative hearing was held before an administrative law judge (ALJ) at the State Office of Administrative Hearings (SOAH). The ALJ then issued a proposal for decision (PFD) on December 18 in which she recommended that the stewards' ruling should be upheld in all respects. In March 2002, the Commission issued a final order adopting all of the findings of fact and conclusions of law in the PFD and upholding the stewards' ruling in full. Appellants then sought review in a Travis County district court, which affirmed the Commission's decision in all respects.

Appellants appeal the administrative proceedings by three issues. In their first issue, appellants contend that the Commission violated the administrative procedure act (APA) by modifying a rule of general applicability without notice and comment rulemaking. Specifically, appellants argue, the Commission imposed a new penalty without prior notice by redistributing the purse for the March 25 race. In their second issue, appellants contend that the Commission's order is not supported by substantial evidence because the Commission failed to maintain the integrity of the split sample, reship the sample within the required time, and notify Keeton of the return and reshipment. Appellants contend in their third issue that the Commission's rule that "[i]n an appeal, the appellant has the burden to prove that the stewards' or racing judges' decision was clearly in error" violates appellants' due process rights. *Id.* § 307.67(c) (2003).

**ANALYSIS**

*Promulgation of Rule without Notice*

In their first issue, appellants contend that the Commission failed to follow the APA by modifying a rule of general applicability without notice and comment rulemaking. Appellants

4

specifically argue that until early 2001, when a horse tested positive for Clenbuterol the "practice" of the Commission's staff was to allow the owner of the horse to keep the purse and the horse's winning position in the race. According to appellants, the Commission imposed a new practice in this instance by redistributing the purse and disqualifying the horse. Furthermore, the Commission failed to give owners and trainers notice of this change until March 29, 2001, four days after the race in question and "too late for anyone in the regulated industry to change their behavior or practice relating to a race that had already been run." The Commission's posting of the change is irrelevant. At the time of the race, the Commission had publicly available rules and policies in effect that gave notice to appellants of the range of penalties available if a horse tested positive for Clenbuterol.

The stewards' authority to impose penalties originates in section 3.07(b) of the racing act:

> The commission shall make rules specifying the authority and the duties of each official, including the power of stewards or judges to impose penalties for unethical practices or violations of racing rules. A penalty imposed by the stewards or judges may *include* a fine of not more than $5,000, a suspension for not more than one year, or both a fine and suspension. Before imposing a penalty under this subsection, the stewards and judges shall conduct a hearing that is consistent with constitutional due process.

Tex. Rev. Civ. St. Ann. art. 179e, § 3.07(b) (West Supp. 2003) (emphasis added).

Appellants argue that the Commission's "policy to redistribute the purse for Clenbuterol positives" was never made public before the race. To the contrary, under the Commission's rules in the administrative code, upon a finding by the stewards that a horse tested positive for any drug, the stewards may

5

(1) *disqualify the animal and order the purse redistributed*;

(2) declare the race animal ineligible to race for a period of time; and

(3) impose penalties authorized by Chapter 307 of this title . . . on . . . the animal's trainer or . . . owner.

16 Tex. Admin. Code § 319.304 (2003) (emphasis added). The penalties under chapter 307 include a fine of not more than $5,000 and license suspension of not more than a year. *Id.* § 307.64 (2003). Under the Commission's Medication Classifications and Penalty Guidelines, issued in January 2001, if a horse tested positive for a class 4 substance, the range of penalties included a fifteen- to sixty-day suspension, up to a $1,000 fine, and *possible loss of purse*.

Appellants contend that the medication classifications are invalid because they were not promulgated under notice and comment rulemaking. The racing commission rules, however, broadly define what was a prohibited drug: "any stimulants, depressants, tranquilizers, local anesthetics, drugs, [or] other drug metabolites which could affect the health or performance of a race animal, however minimal." *Id.* § 319.1(b)(1) (2003). The guidelines then list the specific prohibited substances. "Not every statement by an administrative agency is a rule for which the APA prescribes procedures for adoption." *Texas Educ. Agency v. Leeper*, 893 S.W.2d 432, 443 (Tex. 1994). If every agency policy or procedure had to be promulgated through notice and comment rulemaking, agencies would be deprived of the powers delegated to them. *See Brinkley v. Texas Lottery Comm'n*, 986 S.W.2d 764, 769-70 (Tex. App.—Austin 1999, no pet.). It makes sense that the Commission listed specific drugs in guidelines instead of rules because agencies have greater flexibility in

revising guidelines than rules. In fact, through guideline revisions, the Commission lowered Clenbuterol from a Class 3 to a Class 4 substance the year before the race in question.

The statute, rule, and policy manual were in effect before March 25, 2001, giving appellants and the regulated industry at large notice of the rules and policies in place at the time of the race. All of the penalties imposed upon Keeton and Hays were within the range of the publicly available rules and policies: suspension of forty-five days, fine of $1,250, loss of purse, and disqualification of the horse. Furthermore, both appellants were aware of certain aspects of the rules and policies. Keeton was fined and suspended in December 2000 after another horse tested positive for Clenbuterol. Hays testified at the SOAH hearing that he was specifically aware of Commission rule 319.304, which gives notice of a possible loss of purse and disqualification of the horse. Thus, we reject appellants' contention that the Commission imposed new penalties on them without notice. We overrule appellants' first issue.

### Lack of Substantial Evidence

Appellants contend in their second issue that the Commission's order is not supported by substantial evidence. Under substantial evidence review, we must uphold an agency action unless we find, among other factors, that the action is "[n]ot reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole" *or* is "arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Tex. Gov't Code Ann. § 2001.174(2)(e), (f) (West 2000). Under substantial evidence review, we may not substitute our judgment as to the weight of the evidence for that of the agency. *Texas Health Facilities Comm'n v. Charter Med.–Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex. 1984). We

must first determine whether the evidence as a whole is such that reasonable minds could have reached the conclusion that the agency must have reached to take the disputed action. *Texas State Bd. of Dental Exam'rs v. Sizemore*, 759 S.W.2d 114, 116 (Tex. 1988); *Ramirez v. Texas State Bd. of Med. Exam'rs*, 995 S.W.2d 915, 919 (Tex. App.—Austin 1999, pet. denied). The test is not whether the agency made the correct conclusion but whether some reasonable basis exists in the record for the agency's action. *Railroad Comm'n v. Pend Oreille Oil & Gas Co.*, 817 S.W.2d 36, 41 (Tex. 1991); *Charter Med.–Dallas, Inc.*, 665 S.W.2d at 452. Nevertheless, even after applying a substantial evidence standard of review, we must ensure that the actions of the Commission were not arbitrary and capricious. Agency decisions not supported by substantial evidence are deemed to be arbitrary and capricious. *Charter Med.–Dallas, Inc.*, 665 S.W.2d at 454.

Appellants contend that the Commission's order is not supported by substantial evidence because the Commission failed to follow its rules by not (i) properly storing the sample when it was returned, (ii) reshipping the sample within the required time, and (ii) giving Keeton notice of the return and an opportunity to observe the reshipment to LSU. Appellants further argue that the finding of fact holding Keeton as absolute insurer of the horse "ignores the fact that [the Commission] bases its conclusion on findings tainted by its own failure to follow its rules and procedures."

Appellants' chief complaint in its substantial evidence challenge is that the Commission was obligated to follow the same rules when handling the returned split sample as it followed when it first shipped the sample to LSU. We disagree. The Commission's rules set forth requirements for initially storing and sending split samples, not contingency plans for handling a

8

returned split sample. Appellants do not dispute that the Commission complied with its procedures when first shipping the split sample to LSU: Keeton observed the first packing and shipping of the split sample on April 11 and attested that he had "witnessed and approved, with no objections, the packing and shipping of [the] sample." Appellants also agree that the Commission initially complied with the ten-day deadline to ship the split sample:[3] the Commission notified Keeton of the positive test result on April 5 and initially shipped the sample to LSU on April 11, six days later.

Appellants' complaint is with the handling of the sample after it was returned on April 13. On that day, the receptionist at the Commission's offices signed for the cooler, which Airborne returned because the shipping label had become detached. The receptionist notified Pat Barker, an administrative assistant, who placed the cooler in a file room at room temperature, mistakenly thinking that the cooler had been returned empty. On the following Monday, April 16, after receiving a message from LSU that it had not received the sample, Barker went to the file room and found the cooler in the same place as she had left it, with the metal seal locked and chain of custody form intact. Barker informed Commission investigator Thomas Neely, who instructed her to move the cooler to the freezer, which she did.

The Commission's rules mandate that the Commission's "veterinarian or designee shall store the [split sample] in a matter that ensures the integrity of the specimen." 16 Tex. Admin. Code § 319.362(b); *see also id.* § 319.338 (2003) ("split specimen shall be stored in a manner that ensures the safety and integrity" of the specimen). The Commission's guidelines construing these

---

[3] "To ensure the integrity of the specimen, the split specimen must be shipped to the selected laboratory no later than 10 days after the day the trainer is notified of the positive test." 16 Tex. Admin. Code § 319.362(d) (2003).

9

rules require that "[s]plit samples must be locked in the freezer" before the head test technician leaves for the day, and the freezer must also be locked. Undoubtedly, the Commission followed these rules before the first shipment of the split sample to LSU. Granted, before the second shipment the sample was in an unlocked, unrefrigerated file room from April 13 to April 16. However, Barker found the cooler with the sample undisturbed on the 16th: it was in the same place, with the metal seal locked and chain of custody form intact. Although Barker could have "done some things differently" on the 13th, in the words of the PFD, she immediately notified Neely when she learned that the cooler contained a sample and followed his instructions to place the cooler in the freezer. Barker acted reasonably under the unique circumstances, and there is no evidence of tampering with the sample while it was in an unsecured room.

Appellants further contend that the Commission should have notified Keeton when the sample was returned, allowed him to witness the reshipping of the sample, and reshipped the sample within the ten-day deadline instead of waiting to reship on April 17. As with the rules for freezing the samples, the Commission's rules do not set forth any procedures for handling a returned sample. The Commission undoubtedly complied with notifying Keeton of the positive test, allowing him to request testing of the split sample at a laboratory of his choice, *id.* § 319.362(c), and allowing him to witness the packing and first shipment. *Id.* § 319.362(d). Nothing about the *packing* of the container changed between the time that Keeton witnessed it and the time of the reshipment. The cooler contained the metal seal, intact and locked, and chain of custody form throughout the shipping and reshipping. The record does not show that the cooler had been opened. The Commission's rules simply do not address whether a trainer should be notified of a returned sample or be allowed to

10

witness the reshipping of the sample. What is clear is that the Commission officials reshipped the sample just one day after learning of its return, which was reasonable under the circumstances.

Appellants then contest the integrity of the split sample because it was frozen, thawed, then refrozen before LSU tested it. Appellants point to the discrepancy between the two tests. The Texas A & M laboratory found Clenbuterol in the first sample but did not quantify the amount because of the Commission's zero-tolerance policy: any presence of Clenbuterol constitutes a violation. The head of the Texas A & M laboratory averred in his affidavit that if he had to make a "ballpark" estimate, the concentration of Clenbuterol was one to ten nanograms per milliliter of urine and administration of drug was twelve to forty-eight hours before testing. The head of the LSU laboratory testified that the split sample contained an estimated sixty-six nanograms per milliliter.

The LSU laboratory received the sample in good order and was able to detect the presence of Clenbuterol in the sample. When questioned if the freeze-thaw cycle might impair testing, the head of the LSU laboratory responded, "That's not been my experience. Clenbuterol appears to be a very stable drug. We've had a number of samples that were involved in research . . . that had not been stored properly, but we were still able to detect and confirm the drug in those samples." He went on to say that although the usual result after freezing and thawing would be a lower concentration of Clenbuterol, finding a higher concentration would not be out of the question. The important point is that the LSU laboratory confirmed the presence of Clenbuterol, which is *prima facie* evidence of a violation. *Id.* § 319.361(e). Had the LSU laboratory not been able to test the split sample because of "accident . . . or any other event, beyond the control of the commission," such as a lost shipping label in this case, the original findings would have been "prima facie evidence

11

of the condition of the horse at the time of the race." *Id.* § 319.362(g). We agree with the ALJ that as a matter of theory the sample may have been compromised but as a matter of fact it was not, as evidenced by the LSU test confirming that the sample contained Clenbuterol.

Having concluded that the Commission acted reasonably in storing and resending the split sample and that the integrity of the split sample was not compromised to render the LSU test results unreliable, we further conclude that the finding of fact holding Keeton responsible as absolute insurer of the horse is supported by the record. This conclusion is not based on "findings tainted by [the Commission's] own failure to follow its rules and procedures" but on the Commission's rules for trainers and evidence that Keeton was responsible for the horse on race day. A trainer is licensed by the Commission to train racehorses. Tex. Rev. Civ. Stat. Ann. art. 179e, § 1.03(36) (West Supp. 2003). As "absolute insurer" of the horse, a trainer "shall ensure the health and safety" of a horse and "shall ensure that a horse . . . that runs a race while in the care and custody of the trainer . . . is free from all prohibited drugs, chemicals, or other substances." 16 Tex. Admin. Code § 311.104(b)(1), (2) (2003). The record contains no evidence demonstrating that the horse was in the care and custody of anyone other than Keeton before the race. Therefore, he was the absolute insurer of the horse on the day of the race, March 25, 2001.

In light of the fact that the return of the sample was a unique occurrence that the Commission did not cause, the Commission acted reasonably in storing and resending the sample. Moreover, we find nothing in the record to demonstrate—or even suggest—that any compromise to the integrity of the sample rendered the LSU test results unreliable. A reasonable basis exists in the record for the Commission's action in upholding the stewards' ruling. *Pend Oreille Oil & Gas Co.*,

12

817 S.W.2d at 41; *Charter Med.–Dallas, Inc.*, 665 S.W.2d at 452. Accordingly, we hold that the Commission's order is supported by substantial evidence. Furthermore, nothing in the record demonstrates that the Commission's actions were arbitrary or capricious. We overrule appellants' second issue.

*Unconstitutional Shifting of Burden of Proof*

Appellants contend in their third issue that under the Commission's rule placing the burden of proof on appellants in the appeal of a stewards' ruling, "the accused is unjustly saddled with the obligation to disprove an allegation made against him," in violation of appellants' due process rights. The rule states that "[i]n an appeal, the appellant has the burden to prove that the stewards' or racing judges' decision was clearly in error." 16 Tex. Admin. Code § 307.67(c) (2003).

In its drug testing procedures, the Commission collects specimens from every horse finishing first in a race to test for the presence of prohibited substances. *See id.* § 319.361(b). The sample is then split, with part tested for the Commission. *See id.* § 319.362(a). A positive finding in the first test is "prima facie evidence that the prohibited drug, chemical, or other substance was administered to the animal and was carried in the body of the animal while participating in a race." *Id.* § 319.3(f). The owner or trainer then may request testing of the split sample. *Id.* § 319.362(c). "If the test on the split specimen confirms the findings of the original laboratory, it is considered to be a prima facie violation of the applicable provisions of the chapter." *Id.* § 319.361(e).

We do not perceive any violation of due process in the Commission's rule placing the burden on appellants to show error. As proponent of the charges, the Commission has the burden of establishing appellants' culpability throughout the proceedings. Here, the parties stipulated that

13

the first test detected the presence of Clenbuterol. The second test confirmed the presence of Clenbuterol, which is *prima facie* evidence of a violation. *Id. Prima facie* means "[s]ufficient to establish a fact or raise a presumption unless disproved or rebutted." *Black's Law Dictionary* 1209 (7th ed. 1999). Once the Commission presents *prima facie* proof, the burden of going forward properly shifts to appellants to rebut that proof. Appellants' constitutional challenge is without merit. Accordingly, we overrule appellants' third issue.

## CONCLUSION

Having overruled appellants' issues, we affirm the judgment of the district court upholding the Commission's order.

_____

Jan P. Patterson, Justice

Before Justices Kidd, B. A. Smith and Patterson

Affirmed

Filed: August 14, 2003

14